UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MERCEDES DELACRUZ,                          :

               Plaintiff,            :   REPORT & RECOMMENDATION

                         :

         - against -              :   10 Civ. 05749 (JGK)(MHD)

                         :

MICHAEL J. ASTRUE,
Commissioner of Social Security,           :

          Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO THE HONORABLE JOHN G. KOELTL, U.S.D.J.:

    Plaintiff Mercedes Delacruz filed this action pursuant to the
Social Security Act, 42 U.S.C. §§ 405 (g) and 1383(c)(3). She seeks
review of a February 19, 2010 determination by the Commissioner of
the Social Security Administration ("Commissioner") denying her
application for Social Security disability insurance benefits,
based on a finding that she was not disabled.

    Ms. Delacruz seeks an order reversing the Commissioner's
determination that she was not disabled and awarding her benefits,
or in the alternative, a remand of her case for a new hearing and
decision. The Commissioner seeks affirmance of the decision. For

the reasons set forth below, we recommend that the case be remanded for further consideration and that in all other respects both parties' motions be denied.

## PROCEDURAL HISTORY

On January 30, 2008, Ms. Delacruz filed a Title II application for a period of disability and disability insurance benefits under the Social Security Act, alleging that she had been disabled since June 3, 2006. (Tr. 106-10). The Social Security Administration ("SSA") denied her claim initially on June 24, 2008. (Tr. 52-54). The SSA denied benefits again on September 15, 2008, based on a finding that Ms. Delacruz was capable of substantial gainful activity. (Tr. 112). She then requested a hearing before an administrative law judge ("ALJ"). ALJ Robert Gonzalez considered the matter de novo at a hearing held on January 14, 2010. (Tr. 23-47). Plaintiff, represented by counsel, appeared and testified. On February 19, 2010, the ALJ issued a decision that she was not disabled. (Tr. 16). On May 28, 2010, the Appeals Council denied her request for review. (Tr. 1-5). Ms. Delacruz now seeks judicial review, claiming that she suffers from a herniated cervical disc at C5-6, with right C6 and right L5 radiculopathy, uncontrolled diabetes, uncontrolled hypertension and asthma. (Compl. 2).

2

Both parties have now moved for judgment on the pleadings. Plaintiff argues that: (1) the ALJ failed to properly apply the treating-physician rule by not giving due deference to the medical opinion of claimant's treating doctor; (2) the ALJ failed to acknowledge additional severe impairments documented in claimant's MRI and EMG imaging studies; (3) the ALJ incorrectly determined that claimant is able to communicate in English; (4) the ALJ incorrectly concluded that claimant retained a residual functional capacity for light work despite her impairments; and (5) the ALJ applied improper legal standards in reaching his decision by failing to take into account plaintiff's subjective testimony regarding her pain. Ms. Delacruz therefore seeks an order reversing the Commissioner's decision and awarding her benefits or, alternatively, an order remanding the case for a new hearing.

The Commissioner responds that the determination that plaintiff is not disabled is supported by substantial evidence and not infected with legal error.

3

FACTUAL BACKGROUND

I. Medical Evidence

A. Treating Medical Sources

1. Dr. Walter Nieves

On June 3, 2006, while Ms. Delacruz was at work, she was struck by a boxed child car seat that fell from a conveyor belt. (Tr. 171). She was treated in the emergency room and released the same day without x-rays having been taken. (Tr. 171). On July 31, 2006, Dr. Walter Nieves (whom plaintiff was seeing for pain management) obtained an MRI of Ms. Delacruz's cervical spine, which showed that there was "straightening of the cervical spine with loss of the normal lordosis[1]", as well as "degenerative disc disease with disc space narrowing, spondylosis[2], and arthrosis[3]

---

[1] Lordosis is the "anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side." Dorland's Illustrated Medical Dictionary 1027 (29th ed. 2000).

[2] Spondylosis is "1. Ankylosis of a vertebral joint. 2. A general term for degenerative changes due to osteoarthritis." Id. at 1684.

[3] Arthrosis is "a joint or articulation" or any disease of a joint. Id. at 152-53.

4

of the joints . . . at C5-C6." (Tr. 178). He also noticed a "disc herniation[4] into the right neural foramen abutting the exiting right C6 nerve root." (Id.). Additionally, he obtained an MRI of the lumbosacral spine, which was performed on August 2, 2006. (Tr. 179). This MRI showed disc degeneration[5] from L1-2 through L4-5, and partial disc dessication at the L4-5 disc. (Id.). An MRI of the brain performed on July 31, 2006 found nothing abnormal. (Tr. 171).


### 2. Dr. Annarose Polifrone


Dr. Annarose Polifrone became plaintiff's regular treating physician. She first saw Ms. Delacruz on August 23, 2006, and in her report noted Dr. Nieves' findings. (Tr. 171). Ms. Delacruz had ongoing headaches, and ongoing back and neck pain for which she was receiving physical therapy from a chiropractor, Dr. Mark Leichter. She also reported spasms and tenderness in her back and neck, and her movement was restricted in all planes. (Tr. 173). Dr. Polifrone noted "decreased sensation to pinprick in the right L5 dermatome and the right C6 dermatome" as well a decreased biceps reflex on

---

[4] A herniated disk is one that protrudes and "may impinge on nerve roots." Dorland's Illustrated Medical Dictionary, supra, at 814.

[5] Disk degeneration involves "change of tissue to a lower or less functionally active form." Dorland's Illustrated Medical Dictionary, supra, at 465.

the right. (Id.). Additionally, plaintiff had a slight limp, secondary to low back pain, and a straight leg raise test was positive bilaterally. (Id.). Dr. Polifrone advised Ms. Delacruz to continue with chiropractic care and to bring in her medications at the next visit for review. (Id.).

From August 23, 2006 to April 29, 2009, Ms. Delacruz visited Dr. Polifrone approximately every five to six weeks with no significant changes in condition; on some visits the pain was worse and on others it was about the same. (Tr. 171, 174-77, 205-08). On February 20, 2008, Dr. Polifrone told plaintiff to continue taking her medications, and ordered a new MRI because Ms. Delacruz had stated that her neck pain was getting worse. (Tr. 174). As per Dr. Polifrone's request, on September 8, 2008 Ms. Delacruz had another MRI of the lumbosacral spine, which showed "[m]inimal osteophyte[6] formation . . . at the anterior margins of the bodies of L3 to L5" and "[m]ild degenerative changes, L3-L5 levels." (Tr. 212). The MRI of the cervical spine, taken on the same date, showed degenerative disc disease at C5-6. (Tr. 211). On October 6, 2008, plaintiff had another MRI taken of the cervical spine, which indicated no change

---

[6] An osteophyte is a "bony excrescence or osseous outgrowth." Dorland's Illustrated Medical Dictionary, supra, at 1290.

6

from the prior MRI with respect to the C-6 disc, but early degenerative change of the C6-7 intervertebral disc. (Tr. 206, 209).

In reports dated June 10, 2009 and July 29, 2009, Dr. Polifrone concluded that Ms. Delacruz suffered from a 100 percent temporary impairment and advised that she could not return to work because of "ongoing symptoms." (Tr. 203, 204).

### 3. Dr. Mark Leichter

Plaintiff received chiropractic care from Mark Leichter, D.C. twice weekly beginning June 5, 2006. (Tr. 164). Plaintiff complained of upper back and neck pain with radiating symptoms. (Tr. 164). Dr. Leichter indicated that plaintiff had limited lifting, carrying, standing, walking, sitting, and pushing/pulling abilities. (Tr. 167-68). His diagnoses were: "847.0, 723.3, 850.9 and 847.1." (Tr. 164). These four codes correspond to: neck strain/sprain, cervicobrachial[7] syndrome (diffuse), concussion (unspecified), and thoracic strain/sprain[8], respectively. (Tr.

---

[7] "Cervicobrachial" refers to the neck and arm. Dorland's Illustrated Medical Dictionary, supra, at 325.

[8] A thoracic sprain is a sprain affecting the thorax (chest). Id. at 1834.

213).[9] Dr. Leichter stated that plaintiff's prognosis was "severely chronic [and] guarded." (Tr. 165).[10] On a form for the New York State Workers' Compensation Board, he indicated that plaintiff was unable to perform regular duties at work and that her degree of impairment was "total". (Tr. 213).

B. Consulting Examining Physicians

1. Independent Chiropractic Examination

Ms. Delacruz underwent an independent chiropractic examination by Jeffrey C. Ritholtz, D.C. (Tr. 239). Dr. Ritholtz indicated that he had reviewed plaintiff's MRIs of the brain and cervical spine (both dated July 31, 2006) as well as the MRI of her lumbar spine (dated August 2, 2006). (Tr. 242).[11] He also mentioned having reviewed notes from a Silvia Epelman, M.D. and a disability letter

---

[9] See also International Classification of Diseases, Ninth Edition, Clinical Modification ("ICD-9-CM"), available at http://www.cdc.gov/nchs/icd/icd9cm.htm.

[10] It should be noted that in his report Dr. Leichter repeatedly made reference to an "M.D." or "medical" report (Tr. 165-67), but there is no indication in the record as to which document or report this might refer to.

[11] The report indicates the exam took place on July 6, 2006, but it also lists in the Medical Review Record the MRIs of later dates. Either the report must have been written later, or is wrongly dated.

from Dr. Leichter (Id.). Dr. Ritholtz found that Ms. Delacruz tested positive on her right cervical compression test and diagnosed her with cervical sprain/strain and thoracic sprain/strain. (Tr. 240-41). He recommended chiropractic intervention consisting of two visits a week for six weeks. (Tr. 241). He also opined that plaintiff could "return to work full time with the restrictions of no lifting, pushing, pulling or carrying over 20 pounds." (Id.).

### 2. Social Security Consultative Examination

On June 12, 2008, plaintiff was examined by Social Security consultant and internist Dr. Nabila Salama. In connection with this examination, Dr. Salama did not see Ms. Delacruz's MRI and EMG studies of the back and neck. (See Tr. 188-92). She examined Ms. Delacruz's spine, and noted no restrictions in movement. (Tr. 190). She also examined plaintiff's knee, noting a "[r]ight knee flexion/extension 90 degrees, and left 150 degrees" and "[n]o redness, heat, swelling, or effusion." (Tr. 191). Dr. Salama also stated that plaintiff had "moderate to severe restriction from bending and squatting because of the right knee arthritis." (Id.). In her report she diagnosed claimant with hypertension, diabetes, asthma and possible arthritis in her right knee and back. (Id.).

9

### 3. Residual Functional Capacity Assessment

On June 18, 2008, disability analyst C. Hernandez, who is not a physician (see, e.g., Tr. 163), undertook a residual functional capacity assessment based on a review of plaintiff's medical history and her MRI imaging studies. (Tr. 193-98). His report indicated a diagnosis of a discogenic[12] and degenerative back disorder, with a secondary diagnosis of hypertension. (Tr. 193). Nonetheless, analyst Hernandez opined that plaintiff could stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday and could also sit for the same amount of time. (Tr. 194). He referred to Ms. Delacruz as having occasional postural limitations due to pain, but no manipulative, visual or communicative limitations. (Tr. 195). He also indicated that she could occasionally lift up to 20 pounds and had no limitations with respect to pushing and pulling. (Tr. 194).

### 4. Workers' Compensation Assessment

Plaintiff was also examined by Dr. Joseph P. Laico (an

_____

[12] "Discogenic" means "caused by derangement of an intervertebral disk." Dorland's Illustrated Medical Dictionary, supra, at 510.

10

orthopedic surgeon) in connection with her Workers' Compensation case on July 31, 2007, April 8, 2008 and May 5, 2009. (Tr. 222-38). In his May 5, 2009 report Dr. Laico noted plaintiff's September and October 2008 MRIs of the cervical spine and lumbo-sacral spine. (Tr. 224). He examined plaintiff's neck, but made no observations as to her spine. (Tr. 225). Despite viewing the imaging studies, Dr. Laico found that she was not disabled and that her back symptoms were "not causally related to the accident on June 3, 2006." (Id.). He also asserted that she could return to work, and that her treatment had been "excessive." (Tr. 226). In his prior reports of July 31, 2007 and April 8, 2008, he also concluded that plaintiff could return to work with no restrictions. (Tr. 231, 237).

## II. Administrative Proceedings

### A. The Social Security Administration's Initial Decision

On June 24, 2008, the Social Security Administration issued its initial determination that Ms. Delacruz did not qualify for disability benefits because her condition was "not severe enough" to keep her from working. (Tr. 55). The SSA found that she was unable to perform some kinds of work, but that her back problem was

11

not severe enough to prevent the performance of light work,[13] and that she "could lift a maximum of 20 lbs., with frequent lifting or carrying of objects weighing up to 10 lbs., or walk or stand for much of the working day". (Id.).

B. Plaintiff's Testimony at Her ALJ Hearing

Plaintiff appealed the SSA's decision and appeared with counsel at a hearing before ALJ Gonzalez on January 14, 2010. (Tr. 23). Plaintiff speaks Spanish, and answered questions with the aid of an interpreter (although at times she responded to the ALJ's questions before the interpreter had begun translating (see Tr. 28, 33, 34)).

---

[13] The regulations provide that "light work"

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

12

### 1. Non-Medical Testimony: Age, Education, Work Experience

Plaintiff was born in the Dominican Republic on November 14, 1960, and was thus 49 years old at the time of the hearing. She came to the United States on March 20, 1985. (Tr. 28). When asked how much schooling she had, plaintiff replied: "In Santo Domingo I went up . . . to the third grade. That would be the 11th grade here." (Tr. 28). Then plaintiff stated that she had one year of schooling in the United States. (Tr. 29). Specifically, she said that she "went to primary school to go over the first grade." (Id.). The ALJ did not seek clarification of her testimony on this point.

According to plaintiff, from 1999 to 2003 she worked as a floor person in a factory. (Tr. 133). From 2000 to 2006, she said, she had worked as a stock person at Target, picking up merchandise from a track and putting it on a skid. (Tr. 29-30, 133). The ALJ did not clarify the overlapping dates of her jobs. At Target she worked eight hours a day, five to six of which were spent lifting heavy objects. (Tr. 42-43).

When asked why she had stopped working, Ms. Delacruz responded that she had had an accident in June 2006, when one of the boxes

13

coming down the conveyor belt fell on her head. (Tr. 31). She stated that she has been unable to find work since the accident because she cannot do "heavy work[]" which, according to her, involves lifting 150 or 75 pounds. (Tr. 31). When asked how much she could now lift, plaintiff estimated "three to five pounds." (Id.).

Plaintiff's earnings records reflect that she worked from 1985 to 2007. (Tr. 116). In 1985 she was earning $1,105.52 per year. (Id.). Her highest earnings were in 2005, at $22,216.85. Then, in 2006, the year of the work accident, her earnings dropped to $8,157. (Id.).

Plaintiff stated that she received workers' compensation benefits until August 2009, in the amount of $143.63 every fifteen days. (Tr. 32-33). Plaintiff also received general assistance under what she referred to as "Section 8". (Tr. 33).

2. Medical Testimony

Plaintiff confirmed that her treating physician is Dr. Polifrone. (Tr. 33). Plaintiff also saw Dr. Mark Leichter for physical therapy until November 2009, and Dr. Laico for her

14

workers' compensation case. (Tr. 35, 37).

When asked by the ALJ about her symptoms, plaintiff described having pain all over her back, the right side of the neck and her head. (Tr. 35). She was taking Propo N/APAP (a generic version of Darvocet) and Naproxen for the pain. (Tr. 36). She stated that the medication made her feel better for only twenty minutes, and that without it her pain was a "nine" on a scale of one to ten. (Id.). Even with the medication, her pain was still at a "five or seven." (Id.). Also, she suffered some stomach upset as a side effect of the medications. (Tr. 41). Plaintiff had not had any surgery or injections to treat her injury. (Tr. 37).

The ALJ asked plaintiff how she spends her day. She responded that she watches television, walks a little -- but could walk only "one half block" at a time -- and often leans on items because of the pain. (Tr. 38; see also Tr. 45). When watching TV she can only watch a little because she cannot be seated or standing for a long period of time. (Tr. 43). When asked by her attorney how long she could sit in one place before it became uncomfortable, she replied "around 15, 20 minutes." (Tr. 45). She also testified that she can only stand in one place for five minutes before it becomes uncomfortable. (Id.). She frequently lies down during the day for

15

pain relief (Tr. 43), and her daughter helps her get dressed in the morning. (Tr. 40). When she takes a bus, the bus driver has to lower the step for her to get on, and she has trouble leaning back on the seat cushion because she has to keep her back straight. (Tr. 46). She has trouble sleeping because of the pain from turning, but does not take sleep medication because she believes she is taking "too many pills." (Tr. 38). Apart from her pain medications, she is taking three for diabetes (Metformin, Glimerpride and Actos), and one for hypertension (Lisinopril). (Tr. 39-40, 156, 161).

C. The ALJ's Decision

On February 19, 2010, the ALJ issued his decision, finding that Ms. Delacruz was not "disabled" under sections 216(i) and 223(d)[14] of the Social Security Act. He found that Ms. Delacruz will meet insured status requirements of the Social Security Act through December 31, 2011 and had not engaged in substantial gainful activity since June 3, 2006, the asserted disability onset date. (Tr. 18). He further found that she suffered from degenerative disc

---

[14] Section 223(d) defines disability as: the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A).

disease of the cervical spine at C5-6 and that the condition was a severe impairment because it "ha[d] resulted in some level of functional limitation." (Id.). He noted that Ms. Delacruz suffered from other impairments, including diabetes, hypertension and asthma, but concluded that they were non-severe impairments since they imposed no functional limitations. (Id.). The ALJ further found that none of plaintiff's impairments met the criteria for per se disability, as reflected in the listings contained in Appendix 1 of Part 404, Subpart P of the SSA's regulations. (Tr. 19).

The ALJ next assessed plaintiff's residual functional capacity as a preliminary step to determining whether she could perform her past work, and, if not, whether she was capable of performing other work available in the national economy. The ALJ found that plaintiff could perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). In so concluding, he acknowledged that plaintiff had "occasional postural limitations [but] can sit up to [six] hours per day." (Tr. 19). Although plaintiff's treating physician, Dr. Polifrone, had opined that Ms. Delacruz was disabled, the ALJ found this opinion unpersuasive. (Tr. 21). In reaching that conclusion, the ALJ stated that Dr. Polifrone had relied on claimant's subjective complaints, that her opinion was not supported by objective findings, and that it was inconsistent

17

with other medical and non-medical evidence in the record. (<u>Id.</u>). The ALJ also rejected plaintiff's testimony as to her subjective symptoms because he found her to be "less than credible." (<u>Id.</u>).

Having found plaintiff capable of light work, the ALJ determined that plaintiff was unable to perform her past jobs, and he proceeded to apply the SSA's Medical-Vocational Guidelines found in Appendix 2 of Part 404, Subpart P (also known as "the Grids") to determine plaintiff's disability status. According to the ALJ, she was 45 years old at the time of the onset date, had a limited education[15] and was able to communicate in English, as evidenced by the fact that she had answered some of the ALJ's questions before the interpreter began his translation. (Tr. 21). The ALJ further found that transferability of job skills was not an issue because plaintiff's past work was unskilled. (<u>Id.</u>). Based on these findings, the ALJ concluded that there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (<u>Id.</u>). In light of plaintiff's age, education and work experience, the ALJ concluded that Medical-Vocational Rule 202.17

---

[15] "A person is deemed to have a 'limited' education, absent evidence to the contrary, if he has completed at least the seventh but no more than the eleventh grade." <u>Decker v. Harris</u>, 647 F.2d 291, 297 (2d Cir. 1981); <u>see</u> <u>also</u> 20 C.F.R. § 404.1564(b)(3).

18

applied to claimant.

Rule 202 generally states:

Maximum sustained work capability limited to light work as a result of severe medically determinable impairment(s). (a) The functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work. Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy. These jobs can be performed after a short demonstration or within 30 days, and do not require special skills or experience.

Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(a). Rule 202.17 is part of "Table No. 2-Residual Functional Capacity: Maximum Sustained Work Capability Limited to Light Work as a Result of Severe Medically Determinable Impairment(s)," and it states that if a claimant is a younger individual (aged 18-49), with limited or less education ("[a]t least literate and able to communicate in English") who is unskilled or has no previous work experience, he or she is not disabled. See id. Rule 202.17. Applying this Rule to plaintiff, the ALJ determined that Ms. Delacruz was not disabled. (Tr. 22).

Plaintiff sought appeal of the ALJ's decision with the SSA Appeals Council. (Tr. 8-9). This request was denied on May 28,

2010. (Tr. 1-4). Plaintiff then sought review in this court.

## ANALYSIS

### I. Standard of Review

When a plaintiff challenges the SSA's denial of benefits, the court may set aside the Commissioner's decision only if it was based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)(per curiam)); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006). The substantial-evidence test applies not only to the Commissioner's factual findings but also to the inferences and conclusions of law to be drawn from such facts. See Carballo ex rel. Cortes v. Apfel, 34 F. Supp.2d 208, 214 (S.D.N.Y. 1999). To determine whether substantial evidence exists, the

20

reviewing court must examine the entire record, including any
contradictory evidence. See, e.g., Brown v. Apfel, 174 F.3d 59, 62-
65 (2d Cir. 1999).


As implied by the substantial-evidence standard, it is the
function of the Commissioner, not the courts, to resolve
evidentiary conflicts and to appraise the credibility of witnesses,
including the plaintiff. Carroll v. Sec'y of Health and Human
Servs., 705 F.2d 638, 642 (2d Cir. 1983). While the ALJ need not
resolve every conflict in the record, Miles v. Harris, 645 F.2d
122, 124 (2d Cir. 1981), "the crucial factors in any determination
must be set forth with sufficient specificity to enable [a
reviewing court] to decide whether the determination is supported
by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587
(2d Cir. 1984); accord Snell v. Apfel, 177 F.3d 128, 134 (2d Cir.
1999)(holding that claimant was entitled to an explanation of why
the Commissioner discredited her treating physician's opinion).


Even if the record, as it stands, contains substantial
evidence of disability, the SSA's decision may not withstand a
challenge if the ALJ committed legal error. Balsamo, 142 F.3d at
79. Of particular importance, because a hearing on disability

21

benefits is a non-adversarial proceeding, the ALJ has an affirmative obligation to fully develop the administrative record. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)(citing Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)). The ALJ bears this duty even when the claimant is represented by counsel. Id. Toward this end, the ALJ must make every reasonable effort to help an applicant get medical reports from her medical sources. 20 C.F.R. § 404.1512(d). More specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine [plaintiff's] residual functional capacity." Casino-Ortiz v. Astrue, 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007)(citing 20 C.F.R. § 404.1513(e)(1)-(3)). Therefore, the ALJ must seek additional evidence or clarification when the "report from [plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e)(1). In short, if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information to fill any clear gaps from the physician before dismissing the doctor's opinion. See, e.g., Rosa v.

Callahan, 168 F.3d 72, 79 (2d Cir. 1999)(citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information . . . sua sponte.")).


In addition, the ALJ must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests, and must address all pertinent evidence. See, e.g., Ferraris, 728 F.2d at 586-87; Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, *10 (S.D.N.Y. Aug. 4, 2006)(finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.'" Pacheco v. Barnhart, 2004 WL 1345030, *4 (E.D.N.Y. June 14, 2004)(quoting Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). Courts in this Circuit have long held that an ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp.2d 44, 57 (W.D.N.Y. 2002)(quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

23

As for potential relief for a successful plaintiff, the Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of 42 U.S.C. § 405(g): "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004). If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). "[W]hen 'further findings would so plainly help to assure the proper disposition of the claim, . . . remand is particularly appropriate.'" Butts, 388 F.3d at 385 (quoting Rosa, 168 F.3d at 83). If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. Arroyo v. Callahan, 973 F. Supp. 397, 400 (S.D.N.Y. 1997); see, e.g., Carroll, 705 F.2d at 644 (where "reversal is based solely on the [Commissioner's] failure to sustain [his] burden of adducing evidence of [plaintiff's] capability of gainful

24

employment and the [Commissioner's] finding that [plaintiff] can engage in 'sedentary' work is not supported by substantial evidence, no purpose would be served by our remanding the case for a rehearing").

Therefore, if the ALJ failed in his duty to fully develop the record or committed other legal error, a reviewing court

> should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence. If, on the other hand, the [reviewing] court determines there is substantial evidence of disability in the administrative record, it may decide to reverse the Commissioner's decision, make a determination of disability and remand solely for the calculation of benefits. Such a remedy is an extraordinary action and is proper only when further development of the record would serve no purpose.

Rivera v. Barnhart, 379 F. Supp.2d 599, 604 (S.D.N.Y. 2005).

II. Proof of Disability

For purposes of Social Security disability insurance benefits, a person is "disabled" within the meaning of the Act, and thus entitled to benefits, when she is unable "to engage in any

25

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[16] Carroll, 705 F.2d at 641-42 (quoting 42 U.S.C. § 423(d)(1)(A)).

The Act additionally requires that the impairment be "of such severity that [plaintiff] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Butts, 388 F.3d at 383 (quoting 42 U.S.C. § 423(d)(2)(A)). Furthermore, if a plaintiff can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that openings for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A).

In evaluating disability claims, the Commissioner is required to apply a five-step process set forth in 20 C.F.R. §

---

[16] Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

404.1520(a)(4)(i)-(v). This Circuit has described this sequential

process as follows:

> First, the Secretary considers whether the claimant is
> currently engaged in substantial gainful activity. If
> [she is] not, the Secretary next considers whether the
> claimant has a "severe impairment" which significantly
> limits [her] physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed
> in Appendix 1 of the regulations. If the claimant has
> such an impairment, the Secretary will consider [her]
> disabled without considering vocational factors such as
> age, education, and work experience; the Secretary
> presumes that a claimant who is afflicted with a "listed"
> impairment is unable to perform substantial gainful
> activity. Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, [she] has the residual
> functional capacity to perform [her] past work. Finally,
> if the claimant is unable to perform [her] past work, the
> Secretary then determines whether there is other work
> which the claimant could perform.[17]

---

[17] Residual functional capacity is a claimant's maximum
remaining ability, despite her limitations, "'to do sustained
work activities in an ordinary work setting on a regular and
continuing basis, and the residual functional capacity assessment
must include a discussion of the individual's abilities on that
basis.'" Schultz v. Astrue, 2008 WL 728925, *6 (N.D.N.Y. Mar. 18,
2008)(quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)).
If a claimant has more than one impairment, all medically
determinable impairments must be considered, including those that
are not "severe." The assessment must be based on all relevant
medical and other evidence, such as physical abilities, mental
abilities, and symptomology, including pain and other limitations
that could interfere with work activities on a regular and
continuing basis. 20 C.F.R. § 404.1545(a)(1)-(3).

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996)(emphasis in
original)(quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d
Cir. 1983)).


Plaintiff bears the burden of proof on the first four steps,
but the Commissioner bears the burden on the fifth step, and thus
must demonstrate the existence of jobs in the economy that
plaintiff can perform. See, e.g., Rosa, 168 F.3d at 77; Bapp v.
Bowen, 802 F.2d 601, 604 (2d Cir. 1986). This burden shift is
limited in that the Commissioner need only show that "there is work
in the national economy that the claimant can do; he need not
provide additional evidence of the claimant's residual functional
capacity." Poupore v. Astrue, 566 F.3d 303 (2d Cir. 2009)(citing 20
C.F.R. § 404 1560(c)(2), which makes clear that the Commissioner at
the fifth step will use the same residual functional capacity
assessment used to determine whether claimant could perform past
relevant work). Normally, in meeting his burden on this fifth step,
the Commissioner can rely on the Medical-Vocational Guidelines
contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly
referred to as "the Grids."[18] Zorilla v. Chater, 915 F. Supp. 662,

_____

[18] The Grids take into account the claimant's residual
functional capacity in conjunction with her age, education and
work experience. Based on these factors, the Grids indicate
whether the claimant can engage in any other substantial gainful

667 (S.D.N.Y. 1996). However, if the plaintiff suffers from nonexertional limitations[19], exclusive reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).

When employing this five-step analysis, the Commissioner must consider: (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) plaintiff's subjective evidence of pain and physical incapacity as testified to by herself and others who observed her; and (4) plaintiff's age, education and work history. Carroll, 705 F.2d at 642 (citing Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980)).

_____

work that exists in the economy. Zorilla, 915 F. Supp. at 667. The Grids classify work into five categories based on the exertional requirements of the different jobs. Specifically, it describes work as sedentary, light, medium, heavy or very heavy, based on the job requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling. Id. at 667 n.2.

[19] An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling). Rosa, 168 F.3d at 78, n.2 (citing Zorilla, 915 F. Supp. at 667 n.3). "Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional." Samuels v. Barnhart, 2003 WL 21108321, *11 n.14 (S.D.N.Y. May 14, 2003); see also 20 C.F.R. § 404.1569a(c)(1)(i)-(vi).

III. Assessment of the Record

Applying the required five-step framework to plaintiff, the ALJ found that (1) she had not engaged in substantial gainful activity since June 3, 2006; (2) she had a severe medical impairment: degenerative disc disease of the cervical spine at C5-6, see 20 C.F.R. § 404.1520(c)[20]; (3) she did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526); (4) she had the residual functional capacity to perform the "full range of light work as defined in 20 C.F.R. § 404.1567(b)"; (5) she was unable to perform any past relevant work (20 C.F.R. § 404.1560(b)); and (6) considering plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in

---

[20] The SSA regulation provides:

You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.

20 C.F.R. § 404.1520(c).

significant numbers in the national economy that plaintiff could perform. The ALJ therefore found that plaintiff had not been under a disability as defined by the SSA from the June 3, 2006 incident through the date of decision -- February 19, 2010.

The ALJ committed legal error, and some of his findings are not supported by the record. We consider the errors in the decision in the order in which they arise: first, the ALJ's conclusion that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; second, his finding regarding her residual functional capacity to perform a "full range of light work", specifically his failure to accurately apply the treating-physician rule, to take into account plaintiff's subjective complaints or to provide adequate explanation for his determination; third, his analysis at the fifth step applying plaintiff's age, education, work experience and residual functional capacity to conclude that there were jobs that existed in significant numbers in the national economy that plaintiff could perform; and lastly, the ALJ's overarching failure to adequately develop the record so as to fill in gaps and resolve inconsistencies.

31

A.   The ALJ's Finding that Plaintiff's Impairment Did Not Fulfill the Criteria for a Listed Impairment

The ALJ did not adequately explain his conclusion that plaintiff's impairment, while severe, did not meet one of the listed impairments that results in an automatic finding of disability. Because the impairment that he found -- degenerative disc disease -- may in some instances fit the criteria for a spinal disorder that warrants a finding of disability, his finding that she nevertheless did not meet the relevant requirements must be supported by substantial evidence.

According to the SSA's regulations, "disorders of the spine" may result in an automatic finding of disability. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(1). Degenerative disc disease is one such disorder that in some instances meets the criteria to warrant such a finding. In discussing impairments resulting from spinal disorders, the regulations note that:

> Other miscellaneous conditions that may cause weakness of the lower extremities, sensory changes, areflexia, trophic ulceration, bladder or bowel incontinence, and that should be evaluated under 1.04 include, but are not limited to, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture. Disorders such as spinal dysrhaphism (e.g., spina bifida),

32

diastematomyelia, and tethered cord syndrome may also cause such abnormalities. In these cases, there may be gait difficulty and deformity of the lower extremities based on neurological abnormalities, and the neurological effects are to be evaluated under the criteria in 11.00ff.

Id. § 1.00(K)(4) (emphasis added).

Section 1.04 of Appendix 1 further indicates that for a spinal condition to be deemed a listed impairment, claimant must present a particular disorder in combination with one of several possible elements. Specifically, claimant must demonstrate that she suffers from a spinal disorder:

(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for

33

changes in position or posture more than once every 2 hours;

or

C.    Lumbar    spinal    stenosis    resulting    in pseudoclaudication,    established    by    findings    on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Id. § 1.04.

As discussed above, MRIs taken of plaintiff's spine in 2006 showed degenerative disc disease (Tr. 178) as well as disc degeneration and dessication. (Tr. 179). Follow-up MRIs taken in 2008 showed some degenerative changes. (Tr. 209, 212). Plaintiff tested positive on a cervical compression test done by independent examiner Dr. Ritzholz (Tr. 240), and her treating doctor, Dr. Profilone, documented plaintiff's decreased sensation and restricted movement and found that a straight leg raise test was positive bilaterally. (Tr. 173). The ALJ himself found that Ms. Delacruz had a severe impairment, namely degenerative disc disease of the cervical spine at C5-6. (Tr. 18). However, he concluded without explanation that plaintiff did not present "an impairment or combination of impairments that meets or medically equals one of the listed impairments in [20 C.F.R. Part 404, Subpart P, Appendix

34

1]." (Tr. 19). Indeed, his finding is composed of a single boilerplate sentence. Because SSA regulations list degenerative disc disease as a potential impairment if combined with other conditions -- including nerve root compression -- the ALJ should have explained his finding that plaintiff's spinal disorder did not meet the necessary criteria. If her impairment does medically equal a listed impairment, she would automatically be found disabled, without further analysis. On remand inquiry should be made into whether or not plaintiff's impairment either is or equals a listed impairment.


B.   The ALJ's Finding That Plaintiff Had the Residual Functional Capacity to Perform a Full Range of Light Work


Once it has been determined that a claimant has a severe impairment (Step 3), the claimant's residual functional capacity ("RFC") must be assessed. See 20 C.F.R. § 404.1520(a)(4). The assessment is to be based on "all the relevant evidence in [the] case record," including medical impairments that are not "severe." Id. § 404.1545(a)(1)-(2). The RFC assessment must include: "a thorough discussion and analysis of the objective medical evidence and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if

35

appropriate"; a resolution of inconsistencies in the evidence; and an explanation of the effects of the individual's symptoms and pain on her ability to work. <u>See</u> Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, *7 (S.S.A. 1996).

The ALJ committed legal error in his RFC analysis by failing to conform to the treating-physician rule and failing to indicate what weight, if any, he gave to the opinion of plaintiff's treating chiropractor. He also failed to resolve inconsistencies in the record or adequately explain his assessment of plaintiff's credibility.

      1.   <u>The ALJ Failed to Comply With the Treating-Physician Rule</u>

The ALJ's determination that plaintiff was capable of performing light work was key in his RFC assessment and his ultimate denial of plaintiff's application for benefits. In reaching that determination, the ALJ rejected the opinions of plaintiff's treating physician, who found that plaintiff could not work because of her ongoing symptoms. (Tr. 203, 204).

The SSA's regulations advise that "'a treating source's opinion on the issue(s) of the nature and severity of [a plaintiff's] impairment(s)' will be given 'controlling weight' if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(quoting 20 C.F.R. § 404.1527(d)(2)) (emphasis in original); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa, 168 F.3d at 78-79 (stating that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion). Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993), the opinion of the treating physician is not afforded controlling weight if it is not consistent with other substantial evidence in the record, such as the opinions of other medical experts. Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)(The "treating physician's opinion is not controlling when contradicted 'by other substantial evidence in the record.'")); 20 C.F.R. § 404.1527(d)(2).

37

However, even when the treating physician's opinion conflicts with other medical evidence, the ALJ must still consider various factors to determine how much weight to give the treating doctor's opinion. 20 C.F.R. § 404.1527(d)(2). Among those considerations are: (1) the frequency of examination and length, nature and extent of the treatment relationship; (2) evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the SSA's attention that support or contradict the opinion. Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)); Fox v. Astrue, 2008 WL 828078, *8 (N.D.N.Y. Mar. 26, 2008). Additionally, the regulations direct the Commissioner to "'give good reasons in [his] notice of determination or decision for the weight [he] give[s] [plaintiff's] treating source's opinion.'" Id. (citing 20 C.F.R. § 404.1527(d)(2)). Failure to provide explicit "good reasons" for not crediting a treating source's opinion is a ground for remand. Snell, 177 F.3d at 133 (citing Schaal, 134 F.3d at 505).

Plaintiff claims that the ALJ erred in his application of the treating-physician rule by not giving proper weight to her treating physician's findings. (Pl.'s Mem. 8-11). We agree.

38

In reports dated June 10, 2009 and July 29, 2009, plaintiff's treating physician, Dr. Polifrone, opined that plaintiff was unable to work, as she was continuing to have "neck pain and [lower back] pain with radiation into her arms and legs." (Tr. 204). She also found that plaintiff had "[d]ifficulty sitting/standing/walking for extended periods of time" as well as difficulty getting up from a chair. (Tr. 203). She opined that plaintiff could not return to work due to her ongoing symptoms and was "totally disabled." (Tr. 203, 204). If Dr. Polifrone's opinion as to plaintiff's inability to work were credited, it could direct a finding of disability, because the limitations she describes are inconsistent with an ability to perform the tasks required for light work or even for a full range of sedentary work.

Under the SSA's regulations, "light work" "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In order to be considered able to perform a full or even a wide range of light work, a person "must have the ability to do substantially all of these activities." Id. The same regulation provides that "sedentary work involves lifting no more than 10 pounds at a time" and notes that although a sedentary job is defined

39

as one involving sitting, "a certain amount of walking and standing is often necessary in carrying out job duties." Id. § 404.1567(a). Based on Dr. Polifrone's findings that plaintiff had difficulty sitting, standing, or walking for extended periods of time, plaintiff could not perform the full range of either light or sedentary work. While the inability to perform a full range of sedentary work does not automatically lead to a finding of "disabled", the ability of an individual in this category to adjust to other work requires "an adjudicative assessment of factors such as the type and extent of the individual's limitations or restrictions and the extent of the erosion of the occupational base." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(h)(3). The ALJ conducted no such analysis.

The ALJ did not give controlling evidentiary weight to Dr. Polifrone's opinion, stating that her findings did not have objective support, but rather that her opinion relied mainly on plaintiff's subjective complaints. (Tr. 21). However, objective evidence in the record, including the MRIs, x-rays, and NCV and EMG studies, supports Dr. Polifrone's medical findings.

Contrary to the ALJ's assertion, Dr. Polifrone did provide

objective evidence well supported by medically acceptable clinical and laboratory techniques. In her report of August 23, 2006, Dr. Polifrone included discussion of plaintiff's MRIs taken July 31, 2006 and August 2, 2006 under the care of Dr. Walter Nieves. (Tr. 171). The July 31, 2006 MRI of plaintiff's cervical spine showed degenerative disc disease, spondylosis, arthrosis of joints at C5-C6, and a small focal disc herniation. (Tr. 178). The August 2, 2006 MRI of plaintiff's lumbar spine showed disc degeneration as well as partial desiccation of the L4-5 intevertebral disc. (Tr. 179). Dr. Polifrone also conducted NCV and EMG studies (tests for nerve and muscle conditions) on September 27, 2006, and October 19, 2006, finding right C6 and right L5 radiculopathy. (Tr. 177, 216, 219).

Plaintiff saw Dr. Polifrone approximately every five to six weeks, with symptoms essentially unchanged. Dr. Polifrone conducted physical exams of plaintiff throughout this time. (See Tr. 174-77, 205-08). On September 8, 2008, Dr. Polifrone had x-rays taken of plaintiff's neck and lower back, revealing degenerative disc disease at C5-6 and L3 through L5. (Tr. 207). She also ordered another MRI of the cervical spine, done October 6, 2008, which showed that plaintiff still had early degeneration of the C5-6 intevertebral disc and beginning encroachment of the right C5-6 neural foramen.

(Tr. 206, 209). It also showed degenerative change of the C6-7 intevertebral disc. (Tr. 206, 209).

Moreover, even if Dr. Polifrone had not cited these studies, the ALJ's rejection of her findings would have been improper. "[A] treating physician's failure to include objective support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know the ALJ would consider it critical to the disposition of the case." Fox, 2008 WL 828078 at *8 (citing Rosa, 168 F.3d at 80); Tavarez v. Barnhart, 124 Fed. App'x 48, 50 (2d Cir. 2005). Thus, even if we assume that Dr. Polifrone did not provide enough objective evidence for the record, the ALJ then failed in his duty to develop the record fully. By determining that Dr. Polifrone's opinions and findings were not entitled to controlling weight without seeking additional clarification or information, the ALJ failed to properly develop the record and thereby committed legal error. See, e.g., Rosa, 168 F.3d at 80.

Apart from these errors, the ALJ failed to address some of the key factors cited in the treating-physician regulation. These factors include the duration and nature of the treating

42

relationship, the evidence in support of the treating doctor's
opinion, and the consistency of his opinion with the record as a
whole. 20 C.F.R. § 404.1527(d)(2). According to the regulations,
generally more weight will be given to treating sources because they

> are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [a
> plaintiff's] medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or
> from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

Disarno v. Astrue, 2008 WL 1995123, *3 (W.D.N.Y. May 6, 2008)
(quoting 20 C.F.R. § 404.1527(d)(2)).

As noted above, Dr. Polifrone saw plaintiff every five to six
weeks beginning August 23, 2006. Therefore, she had a longitudinal
perspective of plaintiff's medical conditions, a factor in favor of
granting her opinion more weight that the opinion of examiners who
did not see plaintiff with any frequency.

Despite Dr. Polifrone's extensive knowledge of plaintiff's
condition and the objective medical evidence supporting her opinion,
the ALJ gave greater weight to the independent and consultative

physicians who examined plaintiff. These included Dr. Salama and Dr.
Laico. Dr. Salama conducted a consultative exam of plaintiff on June
12, 2008. She noted that plaintiff had a normal gait and needed no
help changing for the exam, getting on and off the exam table, or
rising from a chair. (Tr. 190). Her diagnoses included hypertension,
diabetes, asthma, and possible right knee and back arthritis. (Tr.
191). She found that plaintiff had "moderate to severe restriction
from bending and squatting because of right knee arthritis." (Id.).


Dr. Laico examined plaintiff in connection with her workers'
compensation claim as an independent examiner. (Tr. 221). He saw
plaintiff on three occasions. On the first, in July 2007, he noted
that he had reviewed some of plaintiff's medical records and
reports. (Tr. 235). He also noted that plaintiff complained of pain,
and that she had a limitation in her range of motion "consistent
with [her] pre-existing degenerative disc disease and spondylosis."
(Tr. 236). He thus determined that her condition was status quo ante
the accident of June 3, 2006. He also noted his impression that
"[t]he length and frequency of treatment has been inordinate." (Tr.
236). He asserted that plaintiff's complaints were "not supported by
objective medical evidence" and that she was not disabled. (Tr.
237).

44

Dr. Laico then saw plaintiff on April 8, 2008. He again noted her complaints of severe pain in her neck, head and legs (Tr. 229), and that she complained of pain "on the lightest touch in the cervical and intrascapular area." (Tr. 230). However, he concluded that she could return to work with no restrictions. (Tr. 231).

On May 5, 2009, Dr. Laico conducted another examination of plaintiff. (Tr. 222). He again noted she complained of pain in her neck, as well as pain in her lower back. (Tr. 223). He indicated that he had reviewed more of her medical records, including two MRIs and x-rays showing degenerative disc disease. (Tr. 224). He again concluded that she was not disabled. (Tr. 225).

Plaintiff was also seen by Dr. Jeffrey Ritholtz, an independent chiropractic examiner. (Tr. 239-42). While he indicated that he thought plaintiff could return to work, he recommended restrictions of no lifting, pushing, pulling or carrying over 20 pounds. (Tr. 241).

As noted, the reports of consultative examiners are generally given less weight because they lack the "unique perspective to the medical evidence that a treating physician's opinion would provide."

Goldthrite v. Astrue, 535 F. Supp.2d 329, 336 (W.D.N.Y. 2008)(citing

20 C.F.R. § 404.1527(d)(2)). "To give [a consulting physician's] one

time examination more weight than [the treating physician's]

opinions representing patient contact and treatment over an

extensive period of time [is] clear error." Id. It is true that Dr.

Laico saw plaintiff more than once. However, three examinations over

two years stands in marked contrast to the regular treatment

conducted by Dr. Polifrone, and Dr. Salama only saw plaintiff on a

single occasion. The ALJ does not adequately explain his reliance on

Dr. Laico's and Dr. Salama's opinions over that of Dr. Polifrone.


        Furthermore, "[a]s explained by the [SSA], when the ALJ's

determination . . . is not fully favorable, e.g., is a denial . .

.[,] the notice of the determination or decision must . . . be

sufficiently specific to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's medical opinion

. . . ." Disarno, 2008 WL 1995123 at *4 (quoting SSR 96-2p, 1996 WL

374188 (S.S.A. 1996)). Significantly, there is nothing in the ALJ's

decision to indicate how much weight -- save that he was not giving

"controlling weight" -- the ALJ gave to Dr. Polifrone's opinion.

(Tr. 21). Therefore, a remand is necessary for the ALJ to re-weigh

the evidence and state explicitly what weight he is giving Dr.

Polifrone's opinion.

### 2. The ALJ's Assessment of Plaintiff's Other Medical Source, Chiropractor Dr. Mark Leichter

In support of her application for disability benefits, plaintiff also offered a report from an additional medical source, chiropractor Dr. Mark Leichter. (Tr. 163-70, 213). The ALJ noted the existence of Dr. Leichter's report but gave no indication of how much weight, if any, he gave to Dr. Leichter's opinion in making his determination. (Tr. 20).

Chiropractors are not listed as "acceptable medical sources" under SSA regulations for purposes of establishing a plaintiff's medically determinable impairments. See 20 C.F.R. § 404.1513(a). That list is confined to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists. Id. However, in determining the severity of a claimant's impairments and how those impairments affect the claimant's ability to work, the ALJ may use evidence from other sources, including chiropractors. Id. § 404.1513(d)(1). The "ALJ has the discretion to determine the appropriate weight to accord the chiropractor's opinion based on all the evidence before

47

him." Monette v. Astrue, 269 Fed. App'x 109, 113 (2d Cir. 2008)(quoting Diaz v. Shalala, 59 F.3d 307, 313 n.4 (2d Cir. 1995)(noting that a chiropractor's opinion may be given "significant weight in appropriate circumstances")). Thus, the opinion of a chiropractor is not given "controlling weight", but may be given "'significant weight' under the appropriate circumstances." Mackey v. Barnhart, 306 F. Supp.2d 337, 344 (E.D.N.Y. 2004)(citing Diaz, 59 F.3d at 313 n.4). In fact, "[a]ll courts agree that the opinion of a treating chiropractor . . . must be accorded *some* weight. . . ." Kostzenskie v. Astrue, 2009 WL 2383307, *3 (N.D.N.Y. July 30, 2009)(quoting Rivera v. Bowen, 665 F. Supp. 201, 206 (S.D.N.Y. 1987))(finding ALJ erred in giving no weight to the opinion of the treating chiropractor).

In this case, Dr. Leichter submitted a report dated May 20, 2007,[21] and had seen plaintiff twice weekly since June 5, 2006. He stopped seeing plaintiff in November 2009. (Tr. 35). Thus, his observations are relevant on the issue of the intensity and persistence of plaintiff's symptoms, which accordingly affect the RFC determination. As discussed, Dr. Leichter found that plaintiff

---

[21] The report is dated May 20, 2007, but it appears this may be a typographical error, as the report form cover is dated May 20, 2008, and the request itself appears to show a date of May 2, 2008. (Tr. 163).

48

had limitations in lifting, carrying, standing, walking, sitting, and pushing/pulling, although he did not specify to what extent. (Tr. 167-68). He also described plaintiff's prognosis as "severely chronic [and] guarded." (Tr. 165). On a form for the New York State Workers' Compensation Board, he indicated that plaintiff was unable to perform regular duties at work and that her degree of impairment was "total". (Tr. 213).

Although the ALJ need not give "controlling weight" to the opinion of Dr. Leichter because he is not an "acceptable medical source", there is no indication that the ALJ considered Dr. Leichter's opinion at all. On remand, the ALJ should explain any weight or lack of weight given to Dr. Leichter's opinion.

### 3.   The ALJ Failed to Properly Address Plaintiff's Subjective Complaints of Pain

Plaintiff argues that the ALJ applied an incorrect legal standard in that he failed to take into account her subjective testimony regarding her pain. (Pl.'s Mem. 6, 16). The ALJ disregarded plaintiff's complaints because he found her lacking in credibility as a witness. (Tr. 20-21). The ALJ's analysis was flawed in this respect, and we find that he incorrectly disregarded plaintiff's subjective complaints of pain without adequate support

49

or explanation.

Throughout the five-step process, "'the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability.'" Perez v. Barnhart, 234 F. Supp.2d 336, 340 (S.D.N.Y. 2002)(quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1989)). Notwithstanding this, a reviewing court must uphold the ALJ's decision to discount a plaintiff's subjective complaints if substantial evidence supports that determination. Rodriguez v. Barnhart, 2006 WL 988201, *5 (S.D.N.Y. Apr. 13, 2006)(quoting Perez, 234 F. Supp. at 341).

The ALJ found that the medical evidence did not "substantiate the allegations" of pain by plaintiff. (Tr. 20). When a plaintiff reports symptoms more severe than medical evidence alone would suggest, however, the ALJ must consider other factors in determining the claimant's credibility. An ALJ "must" consider a broad array of factors in "assess[ing] the credibility of [an] individual's statements about symptoms and their effects." Wright v. Astrue, 2008 WL 620733, *3 (E.D.N.Y. Mar. 5, 2008)(quoting SSR 96-7p, 1996 WL 374186 (S.S.A. 1996)). These include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or symptoms; (3) factors that precipitate and aggravate

50

symptoms; (4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; SSR 96-7p.

In this case, the ALJ found claimant "not to be a credible witness." (Tr. 20). He indicated that during the hearing she was "vague and did not answer questions directly." (Tr. 21). He further found the fact that she appeared to understand some of the questions even before the translator conveyed them to her to be a sign that plaintiff was not credible. He also relied on independent examiner Dr. Laico's observation that plaintiff "appeared to have full range of motion of her neck while distracted but refused to attempt the motions when requested" as support for his finding that plaintiff was "less than credible in her allegations." (Id.).

While it is true that several times at the hearing plaintiff answered a question prior to translation, this has little bearing on

51

her credibility. It is possible for an individual to understand some words or phrases in another language while still failing to comprehend the exact meaning of a question or statement. In fact, plaintiff testified that she can understand "small things" (Tr. 29) but does not consider herself able to "speak English". (Tr. 30). In addition, her response regarding her education level, one of the questions she began to answer before translation, was a confusing one, perhaps an indication that she did not fully understand the inquiry. (Tr. 28). Therefore, plaintiff's beginning to answer a question prior to translation does not support a finding that she is not credible.

The ALJ concluded that although the medical evidence showed "impairments that could have reasonably caused the symptoms alleged," plaintiff's symptoms were "not of such intensity, frequency or duration as to preclude substantial gainful activity." (Tr. 20). He asserted that the MRI of plaintiff's cervical spine showed "only some degenerative changes at C5-6 with a small disc herniation" and that the MRI of her lumbar spine showed "only mild degenerative changes with no disc herniation." (Id.). The ALJ further based his finding on the fact that plaintiff had received "only conservative treatment with no hospitalizations, surgery or injections." (Id.). He relied on the opinions of Dr. Salama and Dr.

Laico rather than that of her treating physician, Dr. Polifrone.

The ALJ's analysis was legally inadequate in that he made no attempt to explore or reconcile inconsistencies, disregarded plaintiff's testimony regarding her pain -- testimony supported by Dr. Polifrone's findings -- and did not discuss the factors, noted above, laid out in the SSA regulations for evaluating a plaintiff's symptoms and pain. See 20 C.F.R. § 404.1529(c)(3).

With respect to her daily activities, plaintiff indicated that she spends a large amount of time lying down because of the pain in her back. (Tr. 43). She testified that she can only sit in one place for around fifteen or twenty minutes before becoming uncomfortable, and can only stand for five minutes. (Tr. 45). In addition, her daughter, who lives with her, helps her put on pants and shoes in the mornings, and she walks "very little." (Tr. 40). She testified that she can only walk one half block at a time, as she feels very uncomfortable in both her legs. (Tr. 45). Her daughter always takes her places when she needs to go somewhere. (Tr. 44). When they take the bus, the driver must lower the step in order for plaintiff to get on. (Tr. 46).

Plaintiff also testified as to her pain and management of the

53

pain. She gets pain in her back, neck and head. (Tr.36). When she does not take her medications, she assessed that on a scale of one to ten, ten being bad pain and one being mild discomfort, her pain is at nine. (Tr. 36). Even with the medications, the pain is only lessened; it never goes away. (Tr. 36-37). During the hearing plaintiff indicated that she was in pain, asking if she could stand up for a minute because her knees hurt. (Tr. 31). The ALJ himself noted that Ms. Delacruz appeared to be "in some discomfort". (Tr. 35). In addition, plaintiff testified that she cannot sleep well at night due to the pain in her neck, back and feet. (Tr. 38).

Plaintiff testified that she takes two medications for pain -- Darvocet and Naproxen -- and that they made her feel better only for approximately twenty minutes. (Tr. 36). She also testified that the pain in her head is always there, and that some of the medications gave her an upset stomach. (Tr. 41). In his decision, the ALJ included no discussion at all of plaintiff's medications. He asserted that her treatment had been conservative because she had not been hospitalized, had not had surgery, and had not received injections. (Tr. 20). He gave no weight to the fact that she takes two different and powerful prescription pain medications. Plaintiff also saw a chiropractor twice weekly to try to help with her condition, but the ALJ did not discuss this fact either.

54

Lastly, the MRIs of plaintiff's spine offer evidence to support her subjective complaints. The MRIs showed evidence of multiple abnormalities, including degenerative disc disease, disc herniation, and disc dessication. (Tr. 178-79; 211-12). The ALJ himself noted that the medical evidence revealed impairments that "could have reasonably caused the symptoms alleged." (Tr. 20). His conclusion that they are not of such "intensity, frequency or duration" as to preclude light work is not adequately explained and appears to be based on a finding as to plaintiff's credibility, resulting in the disregard of her subjective pain.

By failing to discuss important parts of plaintiff's testimony and making an unsupported finding that plaintiff is less than credible, the ALJ failed in his duty to explain his rejection of evidence favorable to plaintiff. He erred in discounting her subjective complaints without adequate explanation.

### 4.   Lack of Support for the ALJ's Determination that Plaintiff Can Perform Light Work

The ALJ determined that plaintiff had the RFC to perform "the full range of light work as defined in [20 C.F.R. § 404.1567(b)]." (Tr. 19). He based this conclusion on the finding that plaintiff

55

"has occasional postural limitations and can sit up to 6 hours per day." (Id.). This determination was integral to the ALJ's overall determination that plaintiff is not disabled, because a finding that plaintiff was only capable of sedentary work (or even less) would be more likely to lead to an ultimate finding of disability. Depending on their vocational profiles, individuals in plaintiff's age range who are not capable of light work but only of sedentary work may be determined to be disabled under the Grids. See, e.g., Rule 201.17.

The ALJ's determination that plaintiff can perform a full range of light work is not supported by plaintiff's treating-source opinions or plaintiff's own testimony. Moreover, his predicate finding that Ms. Delacruz could sit for an extended time -- an essential element of light work -- is difficult to reconcile with the medical evidence in the record.

As discussed above, light work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Jobs in this category require "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." Id. To be considered able to do light work, a person "must have the ability to do substantially all

56

of these activities" and is also considered able to do sedentary
work unless additional limiting factors preclude such work. Id.

The SSA's disability analyst, C. Hernandez, submitted an RFC
report dated June 18, 2008. (Tr. 193-98). In that report, Mr.
Hernandez found that plaintiff could sit, stand and/or walk for
about six hours in an eight hour work day, could occasionally lift
up to twenty pounds and frequently lift up to ten pounds, and that
she had unlimited pushing and pulling abilities. (Tr. 194). The
report also found that plaintiff had postural limitations based on
her pain and the MRI results. (Tr. 195). Mr. Hernandez indicated
that there were one or more treating or examining source statements
in the file -- a disability worksheet indicates that these were
reports by Dr. Polifrone and Dr. Leichter (Tr. 199) -- but that the
"medical source opinion from the CEMD was non specific and cannot be
translated into evaluative terms." (Tr. 197). Mr. Hernandez further
concluded that the "medical source opinion" -- which he did not
identify -- was "not, however, inconsistent with our findings".

Although the ALJ arrived at the same conclusions as Mr.
Hernandez, he did not explicitly adopt the findings of this non-
physician. To support his determination that plaintiff is able to
perform light work, the ALJ relied more specifically on the opinions

57

of the independent examiners. He emphasized that Dr. Salama had

found "only postural limitations," that an MRI had shown "only some

degenerative changes," and that plaintiff had received "only

conservative treatment." (Tr. 20).

The ALJ's reliance on Dr. Salama is problematic. Dr. Salama's

report does not even discuss plaintiff's accident, and while it does

provide observations as to plaintiff's ranges of motion and

mobility, nothing in the report quantifies these abilities so as to

specifically support a finding as to plaintiff's RFC and hence a

conclusion that she can perform light work. In addition, Dr.

Salama's report noted that plaintiff did not walk on her heels or

toes or squat due to the pain in her right knee. Dr. Salama also

took note of plaintiff's complaints of pain while standing, walking,

and climbing stairs. (Tr. 188). She further opined that plaintiff

has "moderate to severe restriction from bending and squatting" due

to her right knee arthritis. (Tr. 191). Dr. Salama gave no opinion

as to the ability of plaintiff to engage in the activities required

for a full range of light work.

Dr. Laico did indicate that he had reviewed plaintiff's medical

records, including the MRIs and x-rays. (See, e.g., Tr. 224). While

opining that plaintiff's injuries related to the accident had been

resolved, he noted that she had back symptoms that he asserted were unrelated to the accident. (Tr. 225). None of Dr. Laico's reports gave any specific RFC estimates but instead simply opined that plaintiff could return to work with no restrictions. (Tr. 226, 231, 237).

Dr. Ritholtz, the independent chiropractor who examined plaintiff, opined that plaintiff could return to work but that she had not reached maximum medical improvement, and that she should not lift, carry, push or pull anything over twenty pounds. (Tr. 241).

No tests were done by Dr. Salama, Dr. Laico, or Dr. Ritholtz regarding plaintiff's ability to stand, walk or sit for the prolonged period of time required for light work. None sought to reconcile their general conclusions with the specifics of the MRIs. Strangely, Dr. Laico opined that plaintiff could return to work at the stock room at Target "with no restrictions". (Tr. 226, 231, 237). In contrast, the ALJ himself noted that plaintiff appeared to be in discomfort during the hearing (Tr. 35), and he made the finding that plaintiff could not return to her prior work. (Tr. 21).

The ALJ's determination that plaintiff can perform a full range of light work is legally inadequate as he gives no explanation as to

how he determined that plaintiff is able to perform such work. Only Dr. Ritholtz, the independent chiropractic examiner, gave any quantitative assessment relevant to an RFC determination, with his finding that plaintiff could not pull, push, lift or carry anything over twenty pounds. (Tr. 241). The other physicians contradict each other and offer no concrete findings relevant to plaintiff's RFC. Only the report of analyst Hernandez gives any other quantitative data, and that report was completed by a non-physician -- not an acceptable medical source under the SSA's own regulations, see 20 C.F.R. § 404.1513(a).

In addition, the ALJ's failure to develop the record or explain his findings precludes any evaluation of whether plaintiff might be capable of some kind of sedentary work. Sedentary work, as discussed previously, involves "lifting no more than 10 pounds at a time", and "a certain amount of walking and standing is often necessary . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). "Occasionally" means "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour work day . . . [and] [s]itting would generally total about 6 hours of an 8-hour workday." SSR 96-9p, 1996 WL 374185, *3 (S.S.A. 1996). Dr. Polifrone's conclusion of total disability is not

60

consistent with a finding that plaintiff could perform a full range of sedentary work, but as she gave no quantitative assessments relevant to an RFC evaluation, it is not clear whether or not plaintiff might be capable of some type of sedentary work -- less than a full range. In cases where an individual is capable of less than a full range of sedentary work, the Medical-Vocational Guidelines "must be used as a framework" and where there is a significant impact on the individual's ability to perform a full range of sedentary work, "if the adjudicator finds that the individual is able to do other work, . . . [he] must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions in the country." SSR 96-9p at *5.

The ALJ failed to explore plaintiff's specific exertional limitations and his finding that she can perform light work is unsupported by the record. His omissions further undermine the ability of an adjudicator to assess plaintiff's ability to perform jobs requiring either a full range or less than a full range of sedentary work.[22] On remand a detailed inquiry must be made into

---

[22] Although "a finding of 'disabled' usually applies when the full range of sedentary work is significantly eroded", SSR 96-9p at *3, there may be jobs accommodating to a claimant's limitations, such as the need to alternate sitting and standing.

plaintiff's specific limitations relevant to her RFC.

C.  The ALJ's Determination of the Existence a Significant
    Number of Jobs in the National Economy

The ALJ also erred in his analysis at the fifth step, in which
he concluded that, considering plaintiff's age, education, work
experience and residual functional capacity, there were jobs that
existed in significant numbers in the national economy that
plaintiff could perform. It was on this basis that the ALJ
determined that plaintiff was not disabled.

1.  The ALJ Erred in Determining Plaintiff's Age

A claimant's age is taken into account at the fifth step, in
determining whether he or she is able to adjust to other work. See
20 C.F.R. § 404.1520(a)(4)(v). "Age" means chronological age, and is
considered along with the claimant's RFC, education and work
experience. 20 C.F.R. § 404.1563(a). The age categories are not

_____

However, "[t]he RFC assessment must be specific as to the
frequency of the individual's need to alternate sitting and
standing [and] [i]t may be especially useful in these situations
to consult a vocational resource in order to determine whether
the individual is able to make an adjustment to other work." Id.
at *7.

applied "mechanically", but rather, when a claimant is on the border
of an older-age category and that category would result in a
determination that the applicant is disabled, the SSA will consider
using that category after evaluating the overall case. Id. §
404.1563(b).

The regulations indicate that determinations will be made using
"each of the age categories that applies to [the claimant] during
the period for which we must determine if [he or she] is disabled."
Id. The SSA divides claimants into three age categories: "younger
person", "person closely approaching advanced age", and "person of
advanced age". Id. § 404.1563(c)-(e). A younger person is defined as
someone under the age of 50, and it is generally considered that for
persons in this category, age will not seriously affect their
ability to adjust to other work. Id. § 404.1563(c). However, for
those aged 45-49, the SSA in some circumstances will recognize a
more limited ability to adjust to other work. Id. The next category,
persons closely approaching advanced age, is defined as those aged
50-54, and in this category the SSA considers that "age along with
a severe impairment(s) and limited work experience may seriously
affect [a claimant's] ability to adjust to other work." Id. §
404.1563(d). For those in the last category, persons of advanced age
-- aged 55 or older -- the SSA considers that age "significantly

63

affects a person's ability to adjust to other work" and thus employs special rules for persons in this category. Id. § 404.1563(e).

The ALJ found that plaintiff's age was 45 years old at the date of the onset of the alleged disability. (Tr. 21). As discussed previously, Ms. Delacruz was born November 14, 1960 (Tr. 21), and thus by the date of the hearing, January 14, 2010, she was 49 years old. As above, the regulations call for application of the age category that applies to a claimant "during the period for which [the SSA] must determine if [the claimant] is disabled." 20 C.F.R. § 404.1563(b). Plaintiff aged from 45 to 49 during the period under evaluation, placing her right on the edge of the next category. The SSA itself says that it does not apply these categories mechanically, yet the ALJ did not address the fact that at the time of the hearing -- at which point plaintiff was still covered by disability insurance -- she was close to the next category. The ALJ failed to take that factor into account and did not explain his decision not to do so.

     2.   The ALJ Failed to Adequately Develop the Record on Plaintiff's Education and Ability to Speak English

A claimant's education level is an important factor in

determining whether a claimant can make an adjustment to other work. See 20 C.F.R. § 404.1520(a)(4)(v). In determining a claimant's education level, the ALJ should consider not only the numerical grade level of formal schooling reached, but also the claimant's ability to communicate in English. See 20 C.F.R. § 404.1564(b). The ALJ in this case found that plaintiff had a limited education and could communicate in English. (Tr. 21). His basis for these findings included a confusing statement by plaintiff regarding her amount of schooling and his observation that although a Spanish translator was present at the hearing, plaintiff at times began to answer a question prior to its translation. (Id.).

Under SSA regulations, claimants are placed into one of four education categories: illiteracy, marginal education, limited education, or high school education and above. 20 C.F.R. § 404.1564(b). The evaluator should ask how long the claimant attended school; whether he or she is able to speak, understand, read and write in English; and whether he or she can do simple arithmetic. Id. § 404.1564(b)(6). The regulations emphasize the difficulty inherent in performing a job when the claimant does not speak or understand English. Id. § 404.1564(b)(5).

A claimant is deemed illiterate if he or she cannot read or

65

write a simple message, even if he or she can sign his or her name. Id. § 404.1564(b)(1). Generally, individuals who fall into this category have had little or no formal schooling. Id. The category of marginal education is generally defined to encompass those whose formal schooling was at a sixth-grade level or below. Id. § 404.1564(b)(2). Individuals in this category have abilities in reasoning, arithmetic, and language skills that are necessary for simple, unskilled work. Id. The limited education category includes those individuals with skills in reasoning, arithmetic, and language, but not enough to allow him or her to do more complex job duties required for semi-skilled or skilled work. Id. § 404.1564(b)(3). Individuals in this category generally have had formal schooling at a seventh-grade through eleventh-grade level. Id. Those in the last category are defined as having abilities in reasoning, arithmetic and language skills at a twelfth-grade level or above, and are generally considered able to do semi-skilled through skilled work. Id. § 404.1564(b)(4).

The ALJ failed to adequately evaluate plaintiff's level of education. When asked about her level of formal schooling, plaintiff indicated that she had completed the third grade in the Dominican Republic, which she then said was equivalent to the eleventh grade here. (Tr. 28). On form SSA-336B, a disability report form, she also

66

indicated that she had completed the eleventh grade. (Tr. 136).
However, she then testified at the hearing that when she came to the
United States she went to primary school "to go over the first
grade." (Tr. 29). She did not finish school in the U.S. but went for
only one year and then left. (Id.). The ALJ failed to clarify this
point to ensure that he correctly understood how many years of
school plaintiff had completed. He also failed to inquire whether
plaintiff could do simple arithmetic, and did not probe any other
skills that she may have developed either at work or through other
means. He further erred in failing to inquire into plaintiff's
reading and writing abilities, and instead based his determination
of her English skills solely on her beginning to answer some
questions before they were translated for her. Her answer to the
question regarding her education was confusing and may have been an
indication that she did not actually fully understand the question
or how to answer it. Therefore, his categorization of plaintiff as
having a limited education is unsupported by the record.


     The ALJ's determination that plaintiff is able to communicate
in English also lacks support. An examination of the record reveals
that plaintiff relied on a translator when she saw Dr. Laico. At her
first medical exam with him she brought a friend to translate (Tr.
233), at the second she was accompanied by another friend (Tr. 228),

and at the third her daughter came with her. (Tr. 222). Dr.
Polifrone, plaintiff's primary treating doctor, speaks Spanish. (Tr.
42). In addition, on plaintiff's disability report form, SSA-3368,
she indicated that she could not speak English. (Tr. 131). She also
testified that while working at Target, she always worked for a
Hispanic supervisor. (Tr. 29). Because, as above, the ability to
communicate in English is an important aspect of a person's
education level with respect to vocation (see 20 C.F.R. §
404.1564(b)(5)), the ALJ erred in failing to adequately develop the
record on plaintiff's English language communication skills.

SSA policy guidelines reiterate that a person's education level
is not determined solely on the basis of his or her statements, but
is "based upon all evidence pertinent to evaluating that person's
educational capacities." SSR 83-10, 1983-91 Soc. Sec. Rep. Serv. 24,
1983 WL 31251, *8 (S.S.A. 1983). The ALJ committed legal error in
failing to develop the record with evidence relevant to plaintiff's
level of education. On remand more inquiry must be made into
plaintiff's education level.

### 3.   Application of the Medical-Vocational Guidelines

The Medical-Vocational Guidelines (or "Grids") were adopted to

68

"increase the consistency and promote the uniformity with which disability determinations are made." SSR 83-10 at *1. The determination of each specific factor -- RFC, age, education, and work experience -- is accompanied by a "Decision" column indicating whether that specific combination of determined factors leads to a finding of disability. Id.; see also 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(d). The rules are not always perfectly applicable. Rather, in cases where one or more of the criteria of a rule are not met, a decision is not directed, but "the rules are used, in conjunction with the definitions and discussions in the text of the regulations, as guidance for decisionmaking." SSR 83-10 at * 1; see also 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(d).

Appendix 2 specifically states that

> a finding of 'disabled' is warranted for those individuals age 45-49 who: (i) Are restricted to sedentary work, (ii) Are unskilled or have no transferable skills, (iii) Have no past relevant work or can no longer perform past relevant work, and (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

Id. § 201.00(h)(1).

This provision could dictate a finding of disability for

69

plaintiff, but the ALJ mechanically applied the Medical-Vocational
Guidelines after making his determination of plaintiff's specific
vocational profile. As above, his analysis of the factors in that
profile was flawed. The ALJ himself found that plaintiff had no
transferable skills and that she was unable to perform her past
relevant work. He failed to adequately determine her English
communication skills and undertook no assessment of her ability to
read or write in English. Lastly, his failure to substantiate his
disregard of Dr. Polifrone's opinion -- an opinion that, if
credited, could lead to a finding that plaintiff was fully disabled,
restricted to sedentary work or limited to less than a full range of
sedentary work[23] -- was clear legal error. Correction of the ALJ's
error in this regard could thus lead to a finding of disability for
plaintiff under Appendix 2. Remand is required to permit the ALJ to
correctly evaluate plaintiff and develop an adequate record.

---

[23] As noted previously, a finding of a capacity to perform
less than a full range of sedentary work does not automatically
result in a decision of "disabled", see SSR 96-9p at *1, but in
such cases, the Medical-Vocational Guidelines would be used "as a
framework". Id. at *4.

D.   The ALJ Failed to Address Inconsistencies in the Record
     and to Affirmatively Develop the Record

The ALJ has an affirmative duty to fully develop the record.
Perez, 77 F.3d at 47. Therefore, as noted, if there are gaps in the
administrative record, the court may properly remand the case for
further development of the evidence or for more specific findings.
See Rosa, 168 F.3d at 82-83. In this case the ALJ failed to develop
the record on inconsistencies with respect to both plaintiff's
medical records and other non-medical evidence.

For instance, as discussed, the opinion of plaintiff's treating
physician, Dr. Polifrone, conflicted with the opinions of the
examining physicians, and yet the ALJ did not adequately specify the
reasons for his reliance on the opinions of the examining physicians
over that of Dr. Polifrone. He also gave no indication of whether he
considered Dr. Leichter's opinion at all. In addition, one of the
examining physicians, Dr. Salama, did not see plaintiff's MRIs or x-
rays before examining plaintiff, and made no mention in her report
of plaintiff's accident. There also may be missing reports and
documents that could have shed light on plaintiff's condition. Dr.
Laico indicated that he had reviewed notes by a Dr. Silvia Epelman
(Tr. 242), but no such notes exist in the record. He also mentioned

71

having reviewed C-4 forms and a disability letter by Dr. Leichter
(Tr. 242), but it is not clear what these documents are or if any
parts of them are included in the record. A request to Dr. Schube
Lartigue -- whom plaintiff saw for treatment for diabetes -- for a
medical report for plaintiff is in the record but there is no
indication whether the doctor ever responded. (Tr. 180-85). As
discussed, the ALJ also failed to obtain specific RFC estimates both
from plaintiff's treating physician and from the consulting
physicians. And while plaintiff's second set of MRIs in 2008 showed
no improvement, to the extent that the ALJ thought there was any
discrepancy between them or lack of reliability, he failed to
explore this point with plaintiff's treating physician or to order
new MRIs.

     The non-medical evidence in the record similarly contains gaps
and inconsistencies. As noted with respect to plaintiff's education,
the ALJ failed to clarify exactly how much formal schooling Ms.
Delacruz had completed. He further failed to inquire as to her
abilities to speak, understand, and read and write English, or to do
simple arithmetic, as required by the SSA's regulations. See 20
C.F.R. § 404.1654(b)(6). The ALJ based his assessment of plaintiff's
English language skills solely on the fact that at times she began
to answer a question before it was translated for her. However,

72

plaintiff appeared to require a translator at some of her medical appointments (see, e.g., Tr. 233, 228), and on Form SSA-3368 she indicated that she could not speak English. (Tr. 131). In addition, the medical release form she completed for the request to Dr. Lartigue was a Spanish language version (Tr. 186), but a medication form filled out by hand was an English-language form. (Tr. 156). Therefore, the record offers inconsistent evidence as to plaintiff's English language abilities.

The ALJ failed to address these inconsistencies and adequately develop the record with respect to both medical and non-medical evidence. Reversal and remand is appropriate in order to further develop the record. See Butts, 388 F.3d at 385.

IV.   Nature of the Remedy

For reasons noted, the Commissioner's decision cannot stand. The question remains, however, whether the case should be remanded for further consideration or simply for calculation of benefits. Plaintiff argues that the decision should be reversed and that she should be awarded Social Security disability benefits subsequent to June 2006 and continuing (Pl.'s Compl. 2; Pl.'s Mem. 20), a decision that would require remanding the case solely for the calculation of

73

benefits. We disagree.

As noted, upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, courts generally remand the matter to the Commissioner for further consideration. Curry v. Apfel, 209 F.3 117, 124 (2d Cir. 2000), abrogated on other grounds as stated in Poupore, 566 F.3d at 306)(citing Rosa, 168 F.3d at 82-83)("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence."). In addition, where the ALJ failed to develop the record sufficiently to make appropriate disability determinations, remand for further findings that would plainly help to assure the proper disposition of plaintiff's claim is particularly appropriate. Butts, 388 F.3d at 386 (citing Rosa, 168 F.3d at 83).

In this case, given the inconsistent findings and opinions of the treating sources and examiners, it cannot be said that the evidence in the record so clearly points to a physically disabling condition as to justify a remand solely for the calculation of benefits. See, e.g., Snell, 177 F.3d at 133. There are, however, gaps in the administrative record and the ALJ has, in various

74

respects, applied improper legal standards and failed to adequately develop the record or to resolve inconsistencies in both plaintiff's medical and her non-medical histories. A remand is therefore appropriate to allow the ALJ to re-weigh the evidence from plaintiff's treating sources and to articulate "good reasons" for discounting Dr. Polifrone's opinion if he still finds such a determination to be correct. See Schaal, 134 F.3d at 505-06. A remand would also allow him to re-evaluate plaintiff's credibility, and to more fully develop the record on her education, including her English language skills. Villani v. Barnhart, 2008 WL 2001879, *11 (E.D.N.Y. May 8, 2008). "If necessary, the ALJ should arrange for a medical advisor to assist him in evaluating the medical evidence, and a vocational expert to assist him in evaluating [plaintiff's] occupational base. . . ." Pabon v. Barnhart, 273 F. Supp.2d 506, 517 (S.D.N.Y. 2003); see also Butts, 388 F.3d at 386-87 (where remand was appropriate because the ALJ failed to call a vocational expert, and thus, the record was incomplete and "further findings" were appropriate "to assure the proper disposition of [the] claim").

CONCLUSION

For the reasons noted, we recommend that plaintiff's motion be granted in part, that the Commissioner's motion be denied, and that

75

the case be remanded for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable John G. Koeltl, Room 1030, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       December 1, 2011

                              RESPECTFULLY SUBMITTED,


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

76

Copies of the foregoing Report and Recommendation have been mailed
this date to:

Irwin B. Silverman, Esq.
166 East Central Avenue
Spring Valley, New York 10977

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
    for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007